Lawrence C. BIENEMAN,
Plaintiff–Appellant,

v.

CITY OF CHICAGO, et al.,
Defendant–Appellees.

No. 88–2399.

United States Court of Appeals,
Seventh Circuit.

Submitted Nov. 1, 1988.

Decided Dec. 13, 1988.*

---

\* The case was orally argued on January 6, 1988, but we dismissed the appeal for want of jurisdiction because the judgment was not final. This new appeal, taken from a final judgment, has been submitted to the original panel for decision without a second oral argument.

Joseph V. Karaganis, Karaganis & White, Chicago, Ill., for plaintiff-appellant.

Calvin Sawyier, Winston & Strawn, Michael M. Conway, Hopkins & Sutter, Chicago, Ill., for defendants-appellees.

Before POSNER, COFFEY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Noise from O'Hare Airport is the subject of this case. Lawrence C. Bieneman, who bought a parcel of land near O'Hare in 1967 and has become a frequent filer, commenced this suit as a class action on behalf of all other residents of northern Illinois adversely affected by noise.[1] Bieneman contended that the City of Chicago (which operates O'Hare) and the airlines using O'Hare intentionally reduced the value of his land by propagating noise and the chemicals in aircraft exhaust. Two counts of the complaint alleged a deprivation of property without due process, a third alleged a taking, and other counts made claims under state tort law.

Decisions by three district judges have left Bieneman empty-handed. Judge Decker dismissed the claims alleging deprivations of property without due process on the ground that entitlements to be free from nuisances and related torts are not "property" within the meaning of the Due Process Clause. Judge Duff, to whom the case was transferred, dismissed the remaining claims. 662 F.Supp. 1297 (N.D.Ill. 1987). Any taking occurred no later than 1976, Judge Duff concluded, so that this suit, filed in 1984, is untimely. The state claims presented under the court's pendent jurisdiction all had been preempted by fed-

---

1. Bieneman became Mayor of Bensenville, Illinois, and that village, joined by three others, filed suit in state court seeking an injunction against the expansion of O'Hare. The villages lost. *Village of Bensenville v. City of Chicago,* 16 Ill.App.3d 733, 306 N.E.2d 562 (1st Dist.1973). Bieneman, as Mayor of Bensenville, was among the signatories to a consent decree affecting planning for growth at O'Hare. *Illinois ex rel.*

*Scott v. Butterfield,* No. 74 C 2440 (N.D.Ill.1974). Bieneman personally was among the plaintiffs in a case challenging the Federal Aviation Administration's plan of redevelopment at O'Hare —another defeat. *Suburban O'Hare Commission v. Dole,* 787 F.2d 186 (7th Cir.1986). So this case is at least the fourth for Bieneman on the topic.

eral statutes and regulations, Judge Duff concluded in reliance on *Luedtke v. County of Milwaukee*, 521 F.2d 387, 391 (7th Cir. 1975). Although Judge Duff reserved decision on the complaint's demand to proceed as a class action, 662 F.Supp. at 1298 n. 1, Bieneman filed a notice of appeal. After we dismissed this as premature, 838 F.2d 962 (7th Cir.1988), Bieneman asked the district court to certify a class limited to some of the legal issues in the case. By then the case had been transferred to Judge Leinenweber, who denied the motion. Judge Leinenweber doubted whether Bieneman, who had lost the case on the merits, was an adequate representative of the class; at all events, the judge thought that the prospect of inconsistent decisions on legal questions was insufficient to call for certification of a class, given the disparate interests of the many thousands of persons affected by operations at O'Hare Airport. Bieneman again appeals, this time from a final judgment.

I

■ Bieneman contests the district court's refusal to certify the case as a class action. Unless the district court abused its discretion, we must respect its decision. *Patterson v. General Motors Corp.*, 631 F.2d 476, 480 (7th Cir.1980); *Adashunas v. Negley*, 626 F.2d 600, 605 (7th Cir.1980); *Susman v. Lincoln American Corp.*, 561 F.2d 86, 90 (7th Cir.1977). There was no abuse. Bieneman's proposed class contained at least 300,000 persons. Some of these undoubtedly derive great benefit from increased operations at O'Hare, which make the area attractive for business and may increase the value of land, even as they make land less attractive for residential purposes. The magnitude of any effect on residential owners depends on topography, flight patterns, and many other variables; homeowners who want to sell to businesses (or are in areas zoned for business) may benefit from extra flights and so oppose homeowners differently situated. No wonder courts routinely decline to certify classes in airport-noise cases. E.g., *Virginians for Dulles v. Volpe*, 344 F.Supp. 573, 575 (E.D.Va.1972), affirmed in

relevant part, 541 F.2d 442 (4th Cir.1976); *Town of East Haven v. Eastern Airlines, Inc.*, 331 F.Supp. 16, 18 (D.Conn.1971), affirmed, 470 F.2d 148 (2d Cir.1972); *Ario v. Metropolitan Airports Comm'n*, 367 N.W. 2d 509 (Minn.1985); *City of San Jose v. Superior Court of Santa Clara County*, 12 Cal.3d 447, 115 Cal.Rptr. 797, 525 P.2d 701 (1974).

■ Conceding this, Bieneman insists that the district court should have certified a class for purposes of legal questions only, such as preemption and the length of the statute of limitations. Such a class could prevent inconsistent outcomes in multifarious cases, achieving the objective of Fed.R.Civ.P. 23(b)(1). Maybe so; some courts have given class treatment to questions of law while reserving issues of fact for individual resolution. *Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1196–97 (6th Cir.1988); *In re Agent Orange Product Liability Litigation*, 818 F.2d 145, 166–67 (2d Cir.1987); *In re School Asbestos Litigation*, 789 F.2d 996, 1008–10 (3d Cir.1986). That this *may* be done does not mean that it *must* be. A court does not abuse its discretion in failing to employ novel procedural devices, especially when there are serious doubts about the adequacy of the plaintiff's representation of the class, even about the existence of a case or controversy with regard to a certification of the sort Bieneman proposes. A class limited to legal claims (such as identifying the period of limitations), leaving the class members to file separate suits if they want to take advantage of the ruling, does not resolve any concrete case, and it looks suspiciously like a request for an advisory opinion. (*Sterling, Agent Orange,* and similar opinions contemplated that questions not covered by the class certification would be resolved by further proceedings in the same case, avoiding this problem.)

Bieneman filed this case as a class action yet pursued it for more than three years without asking the district court to certify a class; he appealed, leaving the class behind, and recovered his zeal to serve as representative only on learning that disposition of the class claim was essential to his

own claim. We suggested on the first appeal that "a class representative who has lost on the merits may have a duty to the class to oppose certification, to avoid the preclusive effect of the judgment". 838 F.2d at 964. Bieneman nonetheless pressed on. What he pressed, however, was a motion for partial certification, abandoning members of the class pleaded in the complaint and many of the issues originally identified for class treatment, in the teeth of our observation that a representative may not unilaterally abandon the class, 838 F.2d at 963. The district court was entitled to doubt that Bieneman is a fit representative of other land owners. See *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977). This is quite enough to support Judge Leinenweber's decision, and we resolve no other questions concerning class certification.

## II

Bieneman alleges that noise and noxious gasses emanating from O'Hare Airport deprive him of property without due process of law, and so allow a remedy under 42 U.S.C. § 1983. The contention is fundamentally that O'Hare is a nuisance, traditionally a subject of state law. Judge Decker believed that maintaining a nuisance does not deprive anyone of "liberty or property" within the meaning of the Due Process Clause. The desire to prosecute a nuisance suit is not based on either liberty or property, the judge held in reliance on *Brown v. Brienen,* 722 F.2d 360 (7th Cir.1983), and *Jackson v. City of Joliet,* 715 F.2d 1200 (7th Cir.1983). As we see things, however, the right question is not whether there is or may be property in a chose in action—to which the answer, if pertinent, is "yes". See *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982). Sending waves of noise across a stranger's land can "take" his property, see *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and therefore

must be able to "deprive" him of "liberty or property" too. The property interest is in the land, not in the right to litigate. That the state's conduct concerning the land is tortious does not eliminate a liberty or property element that otherwise exists. *Brown, Jackson,* and similar cases do not depend on a belief that obnoxious conduct by the state cannot deprive a person of liberty or property. They hold, rather, that the Constitution does not require the state to use civil or criminal process to protect its residents from private aggression or ameliorate the vicissitudes of life. See generally *Archie v. City of Racine,* 847 F.2d 1211 (7th Cir.1988) (en banc).

The state is the aggressor in our case, however. The complaint alleges that state actors manage O'Hare Airport so as to inflict injury on private persons. This formally states a constitutional claim. The immediate hurdle for Bieneman, however, is the principle that negligent conduct does not violate the Due Process Clause, *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and we added in *Archie* that grossly negligent conduct should be treated just like negligence. 847 F.2d at 1218–20. To get anywhere, Bieneman must show that the City of Chicago intentionally or recklessly inflicted injury without due process of law. This is so whether he contends that the violation is procedural or substantive.[2]

No one supposes that the City of Chicago set out to aggravate Mr. Bieneman by jacking up the levels of noise at O'Hare Airport. He is not a member of some prostrate group; owners of land near O'Hare are among the wealthiest and most influential people in Illinois; noise injures without regard to race, religion, and political beliefs. To show "intent" (or at least recklessness), Bieneman maintains that Chicago knows the effect of noise and exhaust gasses, yet does nothing to aid their victims. Put in this way, however, the argument is no different from the one in

---

2. Whether there is such an animal as "substantive due process" when the state affects property that it could choose to take outright is a subject

we need not pursue. See *Coniston Corp. v. Village of Hoffman Estates,* 844 F.2d 461 (7th Cir.1988).

*Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). Statutes reserving public jobs for veterans assist a group almost all members of which are male. Women seeking the jobs contended that the state must have "intended" to do them injury, because everyone intends the natural and probable consequences of his acts—and the consequences of the preference law were apparent. The Supreme Court took a different view of intent in constitutional law, however, distinguishing knowledge from intent, byproduct from objective. A state may know what its laws do, yet may not "intend" all of the consequences. Some of them may be unwelcome fallout from activities undertaken for another reason. The essential question, as the Court saw things, was whether the state acted "at least in part 'because of,' not merely 'in spite of,' [the] adverse effects upon an identifiable group." 442 U.S. at 279, 99 S.Ct. at 2296.

Chicago intends to operate O'Hare Airport, knowing that noise and pollution occur. But it does not operate O'Hare because this is the best way to create noise and fumes. These are unwelcome byproducts. A good way to put the intent question is: "If the consequence at issue were smaller, or its effect were reversed, would the actor find the activity less attractive?" If planes made less noise, would Chicago curtail the size and hours of operation of O'Hare? To put the question this way is to show that Bieneman cannot establish intent.

Recklessness is a proxy for intent, and Bieneman fares no better with the claim that Chicago gratuitously subjects him to noise and pollution. He might say that a government acts recklessly toward something if the government accords it no weight—in prison cases, for example, we say the guards act recklessly if they accord the interests of prisoners no weight and so disdain cries of distress. One might ask from this perspective whether the City would operate O'Hare differently if it owned all of the surrounding land. Cf. William F. Baxter & Lillian R. Altree, *Legal Aspects of Airport Noise,* 15 J.L. &

Econ. 1 (1972). If Chicago would behave no differently, then it must be holding property owners' interests as dear as its own, the pole away from recklessness. Bieneman's complaint does not allege that the City allows O'Hare to be noisier or dirtier than it would if the government owned the surrounding land, and at oral argument Bieneman's counsel denied that it does. This aspect of the case therefore stands or falls on the proposition to know of an adverse consequence, and to do nothing to palliate things, is to "intend" that consequence. Under *Feeney,* the contention fails.

### III

Protests about "deprivations" without due process sound tinny when the state is free to take what it wants—with or without process—so long as it is prepared to pay. A state may take property outright or may condemn an easement for noise, and sometimes under the Constitution it must do so, see *Causby,* although airport noise rarely requires compensation, *Griggs v. Allegheny County,* 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962). See also *Chicago, Burlington & Quincy R.R. v. Chicago,* 166 U.S. 226, 233–41, 17 S.Ct. 581, 583–86, 41 L.Ed. 979 (1897) (applying the Takings Clause of the fifth amendment to the states through the fourteenth). The right step logically is an inverse condemnation action. Bieneman contends that the noise at O'Hare took his land—or at least an easement—no later than 1976, when, Bieneman believes, the din became unbearable. Since this suit was filed eight years later, the defendants insist that it is untimely.

A suit under 42 U.S.C. § 1983 must be filed within the time allowed by state law for personal injury actions. *Wilson v. Garcia,* 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). See also *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (same for § 1981). In Illinois that period is two years, although we held in *Anton v. Lehpamer,* 787 F.2d 1141 (7th Cir.1986), that in light of cases before *Garcia* that might

have engendered reliance on a longer period, the plaintiff would be allowed two years from the decision in *Garcia* or five years from the time the claim accrued, whichever is shorter. Bieneman contends that Chicago took his property in 1976, so under *Anton* he had until 1981 to file a § 1983 action. Bieneman attempts to avoid that outcome by insisting that the takings claim rests on the Constitution rather than § 1983. The district court disagreed, holding that constitutional inverse condemnation suits against state actors depend on § 1983. 662 F.Supp. at 1299–1300. We know from *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 107 S.Ct. 2378, 2386 n. 9, 96 L.Ed.2d 250 (1987), that takings suits may be filed directly under the Constitution. It follows, Bieneman contends, that we should use as the limitations period the most analogous period drawn from state law—which, he submits, is the 20–year time allowed to bring adverse possession actions, a period applied to inverse condemnation suits against governmental units. E.g., *Rosenthal v. City of Crystal Lake*, 171 Ill.App.3d 428, 121 Ill.Dec. 869, 525 N.E.2d 1176 (2d Dist.1988); *DiSanto v. City of Warrenville*, 59 Ill.App.3d 931, 17 Ill.Dec. 289, 376 N.E.2d 288 (2d Dist.1978).

The line of argument works only if three things hold: first, that state rather than federal law supplies the period of limitations for a claim arising directly under the Constitution; second, that the period for adverse possession is the most analogous period of state law; third, that the existence of a claim directly under the Constitution cancels the holding of *Garcia* that the period of limitations applicable to personal injuries governs all constitutional torts, even though state law might use different periods for different wrongs. Each is questionable. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), which applied a four-year period from antitrust law to suits under a different federal statute that did not contain its own period of limitations, shows that the custom of recurring to state law for periods of limitations is not the same as a rule requiring their absorption. See also *DelCostello v. Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983) (applying the six-month period from the National Labor Relations Act to "hybrid" contract-duty of fair representation cases); *In re Data Access Systems Securities Litigation*, 843 F.2d 1537 (3d Cir.1988) (en banc) (applying the three-year period contained in federal securities laws to implied federal rights of action); *Smith v. City of Chicago*, 769 F.2d 408 (7th Cir.1985) (applying a six-month period derived from federal employment laws to actions enforcing rights under a federal consent decree). An appropriate benchmark for this purpose might be the six years provided by 28 U.S.C. § 2401(a) for suits against the United States, a period that is employed to mark the outer limits for purposes of inverse condemnation actions under the Tucker Act, 28 U.S.C. § 1491(a)(1). *United States v. 422,978 Square Feet of Land*, 445 F.2d 1180, 1187–89 (9th Cir.1971); *Stubbs v. United States*, 620 F.2d 775, 784 (10th Cir.1980); cf. *Kabua v. United States*, 546 F.2d 381, 383 (Ct.Cl.1976). If this six-year period were applied, Bieneman still would be out of court.[3] And Chicago contests the submission that if state law supplies a period of limitations, the 20–year adverse possession rule is the most closely analogous. We shall go no further along either path, however, for the third condition cannot be satisfied.

*Garcia* and *Goodman*, which established the periods of limitations applicable under § 1983 and § 1981, resolved two questions: *where* to get the period of limitations, and *which* period to use. The answer to the first of these questions, based on 42 U.S.C.

---

**3.** The 12–year period in the Quiet Title Act, 28 U.S.C. § 2409a(f), might be an alternative benchmark, but this statute applies only when the government claims an interest in land. See *United States v. Mottaz*, 476 U.S. 834, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986); *Block v. North* *Dakota*, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983). The point of Bieneman's suit is that the government *dis* claims an interest in his land but ought to be forced to pay for it anyway, the classic inverse condemnation action.

§ 1988, was "state law". Section 1988 does not apply to a case in which the Constitution rather than a civil rights statute supplies the remedy, although the Rules of Decision Act, 28 U.S.C. § 1652, might have the same effect for other federal litigation. The second question has two parts: (a) shall there be a single period of limitations for all §§ 1981 and 1983 cases, or should different periods be used for different patterns (some analogized to contracts, some to intentional torts, some to negligent torts, some left to the catch-all statute)?, and (b) if one period is to be used, which? *Garcia* and *Goodman* concluded that only one period should be borrowed from state law, the one generally applicable to personal injuries.[4]

These decisions—whether to have a single period, and which period to use—do not depend on § 1988. Nothing in the text or history of that statute speaks to the questions. The Court had to devise its own rule, and it made a practical choice for compelling reasons:

> The experience of the courts that have predicated their choice of the correct statute of limitations on an analysis of the particular facts of each claim demonstrates that their approach inevitably breeds uncertainty and time-consuming litigation that is foreign to the central purposes of § 1983. Almost every § 1983 claim can be favorably analogized to more than one of the ancient common-law forms of action, each of which may be governed by a different statute of limitations.... If the choice of the statute of limitations were to depend upon the particular facts or the precise legal theory of each claim, counsel could almost always argue, with considerable force, that two or more periods of limitations should apply to each § 1983 claim.... The simplicity of the admonition in § 1988 [to use state law] is consistent with the assumption that Congress intended the identification of the appropriate statute of limitations to be

an uncomplicated task for judges, lawyers, and litigants, rather than a source of uncertainty, and unproductive and everincreasing litigation. Moreover, the legislative purpose to create an effective remedy for the enforcement of federal civil rights is obstructed by uncertainty in the applicable statute of limitations, for scarce resources must be dissipated by useless litigation on collateral matters.

*Garcia*, 471 U.S. at 272–75, 105 S.Ct. at 1944–47 (footnotes omitted). See also *Agency Holding*, 107 S.Ct. at 2763–64.

These considerations apply with equal force to claims invoking the Constitution directly. Actions under § 1983 and those under the principal fount of direct suits, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), are identical save for the replacement of a state actor (§ 1983) by a federal actor (*Bivens*). No wonder the only two courts of appeals that have addressed questions concerning limitations under *Bivens* have held that the rules used for § 1983 suits will be applied in full force to *Bivens* cases. *Chin v. Bowen*, 833 F.2d 21, 23–24 (2d Cir.1987); *McSurely v. Hutchison*, 823 F.2d 1002, 1004–05 (6th Cir.1987). When the defendant is a state actor, § 1983 and direct litigation may be interchangeable, the choice between them adventitious. There is no reason to have a different period of limitations, and a strong reason not to: any difference would give the plaintiff an incentive to pick whichever jurisdiction provided the longer period, recreating the uncertainty that the Supreme Court sought to eliminate. We conclude, therefore, that there should be a single period of limitations for all suits in which the Constitution supplies the remedy.

Harmonizing the "direct" suit with the § 1983 suit requires us to go the rest of the way with *Wilson v. Garcia*. The Supreme Court applied the period for personal injuries to all § 1983 cases, recognizing that

---

**4.** The Court has heard oral argument in *Okure v. Owens*, 816 F.2d 45 (2d Cir.1987), cert. granted, —— U.S. ——, 108 S.Ct. 1218, 99 L.Ed.2d 419 (1988), which presents the question whether a different rule should apply when the state has a special period of limitations for intentional torts. This complication need not detain us.

§ 1983 covers many wrongs that states, for domestic purposes, would classify under different statutes. To avoid enervating litigation, the period for direct actions must be the same as the period for § 1983 actions. So pleading this case as a claim directly under the Takings Clause leaves Bieneman exactly where pleading it under § 1983 would have left him: with five years from the wrong, or two years from *Wilson,* whichever is less, to file the complaint. Bieneman missed the time by three years, and the district court properly granted summary judgment for the defendants.

## IV

There remain questions of Illinois law, laid under the pendent jurisdiction. "[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). The district court did not dismiss them but resolved them on the merits—adversely to Bieneman. The court did not give a reason for doing so or recognize that there might be a problem in disposing of state questions after the basis of federal jurisdiction evaporated.

■ The dictum given unqualified in *Gibbs* has been qualified in practice. See *Rosado v. Wyman,* 397 U.S. 397, 404–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970). Although this court regularly directs district judges to remit pendent state claims to state court after wrapping up the federal issues before trial, e.g., *Baltimore Orioles, Inc. v. Major League Baseball Players' Ass'n,* 805 F.2d 663, 682 (7th Cir. 1986), we recognize that courts sometimes ought to dispose of everything at once, that prompt resolution may be dramatically more efficient, justifying the displacement of state questions to the federal tribunal. See *Zepik v. Tidewater Midwest, Inc.,* 856 F.2d 936, 945–46 (7th Cir.1988) (collecting cases). The failings in the federal issues may carry over to the state claims. *Mech-*

*met v. Four Seasons Hotels, Ltd.,* 825 F.2d 1173, 1178 (7th Cir.1987). Or there might be a federal defense to the state claims, one appropriately resolved by a federal court. *Graf v. Elgin, Joliet & Eastern Ry.,* 790 F.2d 1341, 1345–48 (7th Cir.1986). Our case is of this kind. The defendants contended, and the district court held in reliance on *Luedtke,* that federal law preempts any claims otherwise available under state law. 662 F.Supp. at 1300–01. Bieneman recognizes that *Luedtke* governs and asks us to overrule it, which a state court could not do. *Gibbs* permits a federal court to proceed in such a case.

*Luedtke* offered this analysis, which we quote in full: "Since the federal laws and regulations have preempted local control of aircraft flights, *Burbank* [*v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973) ], the defendants may not, to the extent they comply with such federal laws and regulations, be charged with negligence or creating a nuisance. Similarly, § 114.04 of the Wisconsin Statutes cannot be invoked to make unlawful flights which are in accordance with federal laws and regulations.... To the extent that the County may be violating the federal laws or regulations, the plaintiffs should ... exhaust their administrative remedies." 521 F.2d at 391. Since *Luedtke* every court that has examined the question independently has come to the opposite conclusion. *Greater Westchester Homeowners Ass'n v. City of Los Angeles,* 26 Cal.3d 86, 100, 160 Cal.Rptr. 733, 740, 603 P.2d 1329, 1336 (1979), cert. denied, 449 U.S. 820, 101 S.Ct. 77, 66 L.Ed.2d 22 (1980); *Owen v. City of Atlanta,* 157 Ga.App. 354, 277 S.E. 2d 338, affirmed, 248 Ga. 299, 282 S.E.2d 906 (1981); *Krueger v. Mitchell,* 112 Wis. 2d 88, 101, 332 N.W.2d 733, 739 (1983); *Baker v. Burbank–Glendale–Pasadena Airport Authority,* 39 Cal.3d 862, 218 Cal. Rptr. 293, 705 P.2d 866 (1985); *Ursin v. New Orleans Aviation Board,* 506 So.2d 947, 955 (La.App. 5th Cir.1987).[5] The Solicitor General, in a brief filed at the Supreme Court's invitation in *Greater Westchester,*

---

5. *Bryski v. City of Chicago,* 148 Ill.App.3d 556, 101 Ill.Dec. 795, 499 N.E.2d 162 (2d Dist.1986),

finds state claims preempted on the authority of *Luedtke.*

informed the Court that *Luedtke* had been decided incorrectly but that because *Luedtke* stood alone the conflict did not require resolution.

We must decide whether to maintain a go-it-alone position. Three things persuade us that *Luedtke* is incorrect and that we should fess up to the error.

1. Preemption of state law depends on either a comprehensive federal regimen ("occupation of the field"), usually established by express statutory declaration, or a clash between state and federal norms (a fight that the federal rules win under the Supremacy Clause). *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). See also, e.g., *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698–99, 104 S.Ct. 2694, 2699–2700, 81 L.Ed.2d 580 (1984) (collecting cases); *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986); *CTS Corp. v. Dynamics Corp.*, 481 U.S. 69, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). The Federal Aviation Act does not expressly preempt state damages remedies. To the contrary, § 1106 of the Federal Aviation Act, 49 U.S.C.App. § 1506, provides that "[n]othing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." *Luedtke* did not mention this anti-preemption statute. Statutes of this sort save common law remedies even when federal law exclusively determines the content of substantive rules. *International Paper Co. v. Ouellette*, 479 U.S. 481, 497–98, 107 S.Ct. 805, 814–15, 93 L.Ed.2d 883 (1987); *Brown v. Hotel & Restaurant Employees*, 468 U.S. 491, 505–07, 104 S.Ct. 3179, 3187–88, 82 L.Ed.2d 373 (1984). Section 1106 is no exception. *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 298–300, 96 S.Ct. 1978, 1984–85, 48 L.Ed.2d 643 (1976), holds that § 1106 preserves against preemption a claim for fraudulent misrepresentation in selling tickets for air travel. State courts award compensation for takings in inverse condemnation cases, although if there is complete federal preemption the national

rather than the local government should be the payor. State courts award damages every day in air crash cases, notwithstanding that federal law preempts the regulation of safety in air travel. If damages are available for takings, and common law remedies are available on questions of fraud and safety, why not on questions of noise and chemical emissions?

2. *Burbank*, on which we relied in *Luedtke*, was a different kind of problem altogether. The City of Burbank had enacted a curfew, forbidding departures of jet aircraft from a privately-owned airport between 11 p.m. and 7 a.m. This directly regulated the airport's operations, interfering with the Federal Aviation Administration's contrary judgment. The Supreme Court distinguished in *Burbank* between the state's role as a regulator and its role as a proprietor of airports, observing that it was not questioning the ability of a governmental body to determine how it would run its own airports. 411 U.S. at 635–36 & n. 14, 93 S.Ct. at 1860–61 & n. 14. It stepped back from this issue because both reports on the statute establishing federal noise rules stated expressly that local governments could set their own standards as proprietors. See H.R.Rep. 92–842, 92d Cong., 2d Sess. 8–10 (1972); S.Rep. 92–1160, 92d Cong., 2d Sess. 10–11 (1972), U.S. Code Cong. & Admin.News 1972, p. 4655.

So Illinois has some role notwithstanding *Burbank* in governing the amount of noise and pollution that escapes from O'Hare. We need not and do not say just what the role is, although other courts have read *Burbank* as allowing a state to exclude certain kinds of aircraft in order to reduce noise. E.g., *British Airways Board v. Port Authority of New York*, 558 F.2d 75 (2d Cir.1977) (exclusion of Concorde). Illinois might choose to exercise such powers as it has through the City of Chicago, the "owner" of O'Hare. It might withdraw home rule from Chicago and exercise these powers through legislation of general application. Or it might exercise these powers through the courts. Neither the Constitution nor the Federal Aviation Act, as amended by the Noise Control Act of 1972, determines how Illinois apportions its gov-

ernmental powers. *Whalen v. United States*, 445 U.S. 684, 689 n. 4, 100 S.Ct. 1432, 1436 n. 4, 63 L.Ed.2d 715 (1980); *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 615 n. 13, 94 S.Ct. 1323, 1330 n. 13, 39 L.Ed.2d 630 (1974); *Highland Farms Dairy, Inc. v. Agnew*, 300 U.S. 608, 612, 57 S.Ct. 549, 551, 81 L.Ed. 835 (1937); *Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 225, 29 S.Ct. 67, 69, 53 L.Ed. 150 (1908); *Dreyer v. Illinois*, 187 U.S. 71, 83–84, 23 S.Ct. 28, 32, 47 L.Ed. 79 (1902); *United Beverage Co. v. Indiana Alcoholic Beverage Comm'n*, 760 F.2d 155 (7th Cir.1985). Whether Illinois should allow its courts some role in setting noise levels at O'Hare is the state's business. The federal role is limited to defining the powers of the state as an entity. Given the recognition in *Burbank* that the state may govern the operation of airports it owns, the conclusion in *Luedtke* that every conceivable role for state courts has been preempted is untenable.

3. *Burbank* dealt with regulation: the city enacted a substantive rule. Bieneman wants damages, not regulation. Perhaps this is a distinction without a difference. An award of damages is compensatory from Bieneman's perspective, but from O'Hare's it is no different from regulation. The airport and the air carriers see the award of damages as a signal to stop doing whatever led to the decision, just as the monetary penalty for violating an express substantive rule would lead them to desist. Damages for disobeying an acknowledged rule discourage that disobedience and also induce potential defendants to steer clear of the danger zone, to discontinue conduct that in fact complies with the rule but could be mistaken for noncompliance. It is hard (and costly) to determine facts, and the errors inevitable in litigation may discourage beneficial conduct. So too, excessive awards might discourage conduct that is questionable under existing rules but beneficial on balance (and therefore goes unchallenged by the agency with control of the substantive doctrines).

The identity of common law damages and penalties for disobedience to substantive rules could lead to a conclusion that where a state is forbidden to alter the substantive rule, it is forbidden to award damages. *Silkwood v. Kerr–McGee* rejects this equation, however. The Court held in *Pacific Gas & Electric Co. v. State Energy Conservation & Development Comm'n*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), that federal law occupies the field of nuclear safety regulation. Notwithstanding the argument (indeed the truism) that an award of hefty compensatory and punitive damages is a method of regulating safety, the Court concluded that federal law does not preempt common law remedies concerning nuclear safety. "*Silkwood* ... highlights the extreme reluctance of the modern Court to find preemption." Ronald D. Rotunda, *Sheathing the Sword of Federal Preemption*, 5 Constitutional Commentary 311, 317 (1988). If no preemption is the conclusion notwithstanding the absence from nuclear safety legislation of a statute such as § 1106, it must be the appropriate treatment of air travel as well.

*Luedtke* did not mention any of these considerations, and its holding cannot be maintained in the face of them. We overrule *Luedtke* to the extent it holds that all common law remedies for airport noise and pollution have been preempted by federal law.[6]

 A word on what this means. Bieneman wants common law remedies, but these must be remedies for *wrongs*, as in *Silkwood*, or for those aspects of airport operation within the state's control as proprietor under *Burbank*. Federal law governs much of the conduct of O'Hare and its carriers. See 14 C.F.R. Part 36 (noise characteristics of aircraft), Part 150 (noise abatement procedures at airports). A state court could not award damages against O'Hare or its users for conduct required by these regulations, or for not engaging in noise-abatement procedures that the Feder-

6. Because this opinion overrules a portion of the decision in *Luedtke,* it was circulated to all judges in regular active service under Circuit Rule 40(f). No judge requested that the case be heard en banc.

al Aviation Administration considered but rejected as unsafe. Bieneman's complaint suggests that damages should be awarded because there are too many flights per hour, or because the aircraft are older models not fitted with high-bypass turbofan engines, or because the planes do not climb at a sufficiently steep rate after takeoff. These subjects are governed by federal law, and a state may not use common law procedures to question federal decisions or extract money from those who abide by them. There may be, on the other hand, aspects of O'Hare's operations that offend federal law, or that federal norms do not govern. Perhaps, as Bieneman insists, the airport does not use adequate noise baffles around the perimeter of the airport, or perhaps it has built more runways than federal law requires (to the detriment of those under the new ones), or is out of compliance with the governing federal rules. The essential point is that the state may employ damages remedies only to enforce federal requirements (as in *Silkwood*) or to regulate aspects of airport operation over which the state has discretionary authority.

This disposes of the federal defense to the claims under state law. Remaining questions about the common law of Illinois are more appropriately resolved in state court, since no ground of federal jurisdiction survives. We therefore affirm the district court's judgment to the extent it rejects all of Bieneman's claims under the Constitution, vacate the judgment to the extent it holds that claims under state law are preempted, and remand with directions that the court relinquish jurisdiction under *Gibbs*, so that Bieneman may pursue his state-law contentions in state court.