Claire RAND, custodian for Brett Rand, Plaintiff–Appellant,

v.

MONSANTO COMPANY, Defendant–Appellee.

No. 90–1442.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 2, 1990.

Decided Feb. 20, 1991.

Ira J. Bornstein, Harvey J. Barnett, Barnett, Bornstein & Blazer, Chicago, Ill., Jules Brody, Mark Levine, Stull, Stull & Brody, Joseph H. Weiss, New York City, Michael Malakoff, Berger, Kapetan, Malakoff & Myers, Pittsburgh, Pa., for plaintiff-appellant.

Joan M. Hall, Lawrence C. Begun, Jerold S. Solovy, William D. Heinz, Marquerite M. Tompkins, R. Edward Wilhoite, Jr., Jenner & Block, Chicago, Ill., for defendant-appellee.

Before EASTERBROOK, MANION, and KANNE, Circuit Judges.

EASTERBROOK, Circuit Judge.

■ Brett Rand bought 200 shares of stock in Monsanto Company on July 23, 1985, five days after Monsanto announced plans to acquire G.D. Searle & Company. He argues in this securities suit that Monsanto committed fraud by not disclosing Searle's potential liabilities for its Cu–7 intrauterine device, the subject of an article that Business Week published on October 4, 1985. The day after the article appeared, Monsanto stock fell from 46¾ to 41⅛. The price later rose, however, and Rand sold his stock in March 1986 for 56¾ per share, a small advance over the 55⅛ he paid in July 1985—which does not disqualify him from recovering any loss attributable to the concealment of material information that Monsanto had a duty to disclose. *Goldberg v. Household Bank, f.s.b.*, 890 F.2d 965, 966–67 (7th Cir.1989).

■ After the district court refused to allow Rand [1] to represent the other purchasers (1,600 plus an unknown number dealing in street name), Monsanto offered $1,135, the full amount by which answers to interrogatories assert that Rand was injured, plus the costs of the suit. See Fed.R.Civ.P. 68. When Rand refused the offer, the district court properly entered

**1.** "Rand" throughout this opinion refers to Richard Rand, Brett's custodian at the time of the transactions and the original representative plaintiff. Claire Rand was substituted as custodian and plaintiff on her husband Richard's death.

judgment against him. 130 F.R.D. 87 (N.D.Ill.1990). Once the defendant offers to satisfy the plaintiff's entire demand, there is no dispute over which to litigate, *Alliance to End Repression v. Chicago*, 820 F.2d 873 (7th Cir.1987), and a plaintiff who refuses to acknowledge this loses outright, under Fed.R.Civ.P. 12(b)(1), because he has no remaining stake. Accord, *Zimmerman v. Bell*, 800 F.2d 386, 390 (4th Cir.1986); *Abrams v. Interco Inc.*, 719 F.2d 23, 32–34 (2d Cir.1983); *Spencer–Lugo v. INS*, 548 F.2d 870 (9th Cir.1977). Under *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980), however, the dispute about certification of the class survives.

Monsanto took Rand's deposition and used the results as the basis for opposing class certification. Rand revealed that he had consulted with his lawyers "maybe once or twice" during the three years between the filing of the suit and the deposition. He was startled when counsel for Monsanto told him that according to his lawyers' answers to interrogatories, his maximum claim was $1,135; Rand said that he believed that he could receive $100,000. This led to an exchange about who would bear the costs of the suit if Monsanto should prevail. Rand said that counsel were advancing the costs of suit and had agreed not to seek reimbursement for any costs exceeding $25,000, a cap that looks unattractive if Rand's maximum award is $1,135:

Q: Would you accept the risk of bearing $25,000 in cost based on a recovery of $1,100 and change, as you've put it?

A: No. That doesn't sound feasible.

. . . . .

Q: ... [A]re you willing, still, to bear responsibility for up to $25,000 in costs, even though you now understand that your total maximum recovery under your lawyer's theory is $1,100? ...

A: No.

Although this exchange reveals that Rand is a rational investor, Monsanto argues that it also establishes that he is a poor representative of the class. The deposition as a whole, according to Monsanto, shows that Rand is a figurehead with neither intellectual nor financial commitment to this suit. In a deposition taken in unrelated litigation, Rand stated that he was not the representative but only a member of the class in the suit against Monsanto, reinforcing this submission.

The district court held that "[a]lthough Mr. Rand meets all of the other requirements for representing the class which he has defined, he is inadequate to protect class interests because he is unwilling to risk responsibility for the payment of costs." 1989 WL 27458, 1989 U.S.Dist. LEXIS 2936 at *19. The court derived this largely from its conclusion that Local Rule 3.54(b), adopting the ABA's Model Code of Professional Responsibility, forbids counsel to bear the costs of suit themselves. Disciplinary Rule 5–103(B) of the Model Code requires the client to remain responsible for costs, even if counsel advance the money. As Rand refused to underwrite the costs, no one was willing (or, in the case of counsel, able) to do so. In denying a motion for reconsideration, 1989 WL 51415, 1989 U.S.Dist. LEXIS 5228 at *2–3, the judge stated: "we are bound by the decision in *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ... that it is the named plaintiff's responsibility to pay class notice costs". The court added that Rand's "unwillingness to pay costs is a sign that he will not vigorously pursue his claim (even if his attorneys will) and that he is, therefore, inadequate." *Id.*, 1989 WL 51415, 1989 U.S.Dist. LEXIS 5228 at 3.

 If we understood the district court's opinion entirely as an assessment of Rand's commitment to this litigation, we would affirm. Appellate review of class certification decisions is deferential, *Bieneman v. Chicago*, 864 F.2d 463, 465 (7th Cir.1988). Although a representative plaintiff need not immerse himself in the case—small stakes imply large benefits from the division of labor, with lawyers handling details, *Kamen v. Kemper Financial Services, Inc.*, 908 F.2d 1338, 1349 (7th Cir. 1990), cert. denied on this question and

granted on an unrelated issue, —— U.S. ——, 111 S.Ct. 554, 112 L.Ed.2d 561 (1990) —the named plaintiff must have *some* commitment to the case, so that the "representative" in a class action is not a fictive concept. Ensuring that the suit stems from real grievances of real persons is especially important in securities class actions. The costs of litigation are so great, the potential damages so high, and the sources of payment so likely to disappear in the event of victory after trial, that many cases settle for substantial sums, which one careful study has found to be unrelated to the strength of the claim. Janet M. Cooper, *Do the Merits Matter? A Study of Settlements in Securities Class Actions*, Stanford Law School Working Paper No. 73 (Nov. 1990). Courts ought not set this engine in motion at the request of a person so uninterested that he does not even know he is a plaintiff, or so deluded that he thinks he can recover $100,000 because his 200 shares of stock fell 4⅝ (a total of $915) when bad news appeared.

■ Yet the district court did not stop with the observation that Rand is the wrong plaintiff because the litigation is founded on a fantastic belief about damages or because Rand is substantially more detached from the case than the norm in securities litigation. Instead the court concentrated on Rand's unwillingness to be responsible for costs. To use Rand's unwillingness to pay *anything* as a clue to his lack of interest in the litigation is one thing; to use his unwillingness to pay *everything* as an absolute bar, as a *per se* rule of inadequacy, is another. Much language in the opinions suggests that the court was of the latter view, and a decision built on that foundation cannot stand.

■ Rule 23 contemplates, and the district court should insist on, a conscientious representative plaintiff. All class suits create some conflict between the representative and the class; the representative and counsel may be tempted to sell out the class for benefits to themselves. Judges are on the lookout for persons who may pay inadequate attention to the interests of the others they purport to represent. A conscientious plaintiff is likely to be willing to make some financial commitment to the case. But no person need be willing to stake his entire fortune for the benefit of strangers. Class lawsuits can be frightfully expensive: the costs (apart from legal fees) include not only the notice to the class but also the reporter's fees for depositions, duplication expenses, payments to express delivery services, and the like. No (sane) person would pay the entire costs of a securities class action in exchange for a maximum benefit of $1,135. None would put up $25,000 or even $2,500 against a hope of recovering $1,135.

Class actions assemble small claims— usually too small to be worth litigating separately, but repaying the effort in the aggregate. A representative plaintiff gains nothing from the collective proceeding. Under the district court's rationale, however, he could well lose, because filing the class suit would expose him to the entire costs of the case. The class as a whole might be willing to pay the costs. Lawyers, who unlike the representative plaintiff receive compensation reflecting any benefits conferred on the class as a whole, also may be willing to underwrite the costs. Lawyers can spread risk not only across the partners of the firms but also across cases. One loss does not mean disaster if the firms have portfolios of actions, as they will. But the representative cannot diversify in this way and cannot collect a reward for bearing exceptional risk in a single case. The very feature that makes class treatment appropriate—small individual stakes and large aggregate ones—ensures that the representative will be unwilling to vouch for the entire costs. Only a lunatic would do so. A madman is not a good representative of the class!

*Eisen v. Carlisle & Jacquelin* does not require the representative to bear the costs personally. The question in *Eisen* was whether a judge may order the defendant to foot the bill for sending notice to the class; the Court held that a judge may not.

*Eisen* did not present any question concerning the apportionment of costs between counsel and the representative.

■ Local Rule 3.54(b) affords no stronger ground. Local rules are valid only to the extent they are consistent with the national rules, Fed.R.Civ.P. 83, and if Local Rule 3.54(b) indeed requires the representative plaintiff to underwrite all costs personally, it is inconsistent with Fed.R. Civ.P. 23 because it would cripple the class action device that rule creates. We doubt that DR 5–103(B) of the Model Code, which Local Rule 3.54(b) incorporates, indeed requires the representative plaintiff to pick up the entire tab. DR 5–103(B) says that lawyers may advance costs but that the client ultimately bears responsibility for them. In a class action, the client is the class. It may be that if the action fails the class's debt to the lawyer is not collectible, but DR 5–103(B) does not ensure that lawyers always will be able to collect. If it did, no lawyer could take any case on behalf of a poor person, for collecting costs from such a client is problematic.

At all events, DR 5–103(B) is part of the Model Code, long in the tooth and being replaced by the ABA's Model Rules of Professional Conduct (1983). Model Rule 1.8(e) allows a lawyer to pick up the tab for costs if the suit is unsuccessful. Some jurisdictions have gone further, allowing counsel to pay the medical and living expenses of the plaintiff during the litigation to ensure that financial hardship does not induce the plaintiff to accept a low settlement offer. See District of Columbia Rule of Professional Conduct 1.8(d) (Mar. 1, 1990), and accompanying commentary. The Northern District of Illinois adopted the ABA's Model Code while that prevailed in the state courts of Illinois. On August 1, 1990, after the district court's decision, the Model Rules, including Rule 1.8(E),

went into force in Illinois. A majority of the states now follow the Model Rules. See Geoffrey C. Hazard, Jr., & W. William Hodes, 2 *The Law of Lawyering: A Handbook on The Model Rules of Professional Conduct* 1255 (1990 ed.).

■ Whether the Northern District of Illinois changes its local rules to track those of Illinois is in the end unimportant. Rule 23 is designed for the nation as a whole. Slavishly following the different state rules on the allocation of costs would balkanize litigation. The appendix to this opinion shows the magnitude of the problem. Investors throughout the world traded in Monsanto's stock between July 23 and October 4, 1985. Rand's trade was executed in New York. Lead counsel are based in Pittsburgh; Rand's other lawyers maintain offices in Chicago and New York. Rand could have filed this suit in the federal courts of Pennsylvania without encountering a problem under DR 5–103(B). For that matter, Rand could have filed this suit in six of the seven districts in the Seventh Circuit; only the Northern District of Illinois follows the Model Code.[2] No useful purpose would be served by telling Rand to refile this suit in another district, or by encouraging counsel to recruit a different plaintiff to file in another district. Indeed, so far as we can tell DR 5–103(B) itself serves no good purpose. The ABA has jettisoned, and the states are in the process of replacing, this relic of the rules against champerty and barratry. Monsanto does not contend that the application of DR 5–103(B) to class actions would produce any discernible benefit. We conclude that DR 5–103(B) is inconsistent with Rule 23 and therefore may not be applied to class actions. Accord, *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1413–15 (E.D.N.Y.1989). See also *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981), invalidating another

---

**2.** The Eastern and Western Districts of Wisconsin, and the Central District of Illinois, have no ethical rules beyond general injunctions to behave appropriately. The Southern District of Illinois follows the Uniform Federal Rules of Disciplinary Enforcement, which does not speak to the allocation of costs between lawyer and client. The Northern and Southern Districts of Indiana follow Indiana's rules; Indiana has adopted the ABA's Model Rules.

local rule of ethics that frustrated the use of class actions. Compare *Kolibash v. Committee on Legal Ethics*, 872 F.2d 571 (4th Cir.1989), with *United States v. Klubock*, 832 F.2d 664 (1st Cir.1987) (in banc) (equally divided court).

Nothing in our discussion of the interaction between Rule 23 and Local Rule 3.54(b) disables the district judge from assessing whether Rand is an adequate spokesman for the class. All we have held is that a district court may not establish a *per se* rule that the representative plaintiff must be willing to bear all (as opposed to a pro rata share) of the costs of the action. Whether Rand is an appropriate representative remains a question committed to the district judge's discretion. We vacate the judgment and remand so that the district court may assess the situation free of the influence of DR 5–103(B). Rand must understand that if the district court adheres to its conclusion, he will get no further aid from this court.

VACATED AND REMANDED.

## Appendix

The district courts have a variety of local rules on attorney discipline. A list follows. Citations to "Rule ___" mean "Local Rule ___".

### I. *Code Districts, Unilateral*

These districts have adopted the ABA Code of Professional Responsibility, without regard to state rules.

D. Hawaii . . . . . . . . Rule 110(3)
N.D. Ill. . . . . . . . . . Rule 3.54(b)
N.D. N.Y. . . . . . . . . Rules 2(a) and 4(f)
E.D. Okla. . . . . . . . Rule 4(j)
N.D. Okla. . . . . . . . Rule 4J
M.D. Tenn. . . . . . . . Rule 1(e)(4)
W.D. Tenn. . . . . . . . Rule 1(c)

### II. *Canons Districts, Unilateral*

The following districts announce that the Canons of Professional Ethics apply to attorney discipline in the district. (Because the Code of Professional Responsibility

springs from the Canons, these districts are effectively "Code districts".)

S.D. Fla. . . . . . . . . . Rule 16C
S.D. Ga. . . . . . . . . . Section IV, Rule 5(d)
D. Mont. . . . . . . . . . Rule 110(3)

### III. *Rules Districts, Unilateral*

No districts have expressly adopted the ABA Model Rules of Professional Conduct independently of the states in which they sit.

### IV. *State Rules Districts*

The districts below follow whatever disciplinary rules the state in which the district court sits uses. Some of these states have the Code and some the Rules.

#### A. *Code states*

N.D. Cal. . . . . . . . . Rule 110(3)
C.D. Cal. . . . . . . . . . Rule 2.5.1
S.D. Cal. . . . . . . . . . Rule 110(5) (the district also enforces the ABA Code)
E.D. Cal. . . . . . . . . . Rule 184(b)
D. Colo. . . . . . . . . . Rule 306 & App. A
N.D. Ga. . . . . . . . . . Rule 110(3)
D. Mass. . . . . . . . . . Rule 83.6(4)(B)
D. Neb. . . . . . . . . . . Rule 5B
S.D. N.Y. . . . . . . . . Rule 4(f) (the district also enforces the ABA Code)
E.D. N.Y. . . . . . . . . Rule 4(f) (the district also enforces the ABA Code)
D. Ore . . . . . . . . . . Rule 110–6(a)
E.D. Tenn. . . . . . . . Rule 4.1
E.D. Va. . . . . . . . . . Rule 7(I)

#### B. *Rules states*

D. Ariz. . . . . . . . . . . Rule 7(d)
D. Conn. . . . . . . . . . Rule 3(a)1 (with minor alterations in Rule 3(a)2)
D. Del. . . . . . . . . . . Rule 8.2.D(2)
D. D.C. . . . . . . . . . . Rule 706(a)
N.D. Fla. . . . . . . . . Rule 4(G)(1) (this rule adopts Florida's version of the ABA Code; as Florida has switched to the ABA Rules, we assume that the district court follows automatically)

M.D. Fla. . . . . . . . .Rule 2.04(c)
D. Idaho . . . . . . . . .Rule 1–107
N.D. Ind. . . . . . . . .Rule 1(g)
S.D. Ind. . . . . . . . .Rule 1(f) (arguably adopts Model Rules independent of the state's rules)
D. Kan. . . . . . . . . . .Rule 407(a)
E.D. Ky. . . . . . . . . .Rule 3(b)(2)(E)
W.D. Ky. . . . . . . . .Rule 3(b)(2)(E)
E.D. La. . . . . . . . . .Rule 20.04
M.D. La. . . . . . . . . .same
W.D. La. . . . . . . . . .same
E.D. Mo. . . . . . . . . .Rule 2(G)(2)
D. Nev. . . . . . . . . . .Rule 120.8(a)
D. N.H. . . . . . . . . . .Rule 4(d) & (e)
D. N.J. . . . . . . . . . .Rule 6A (arguably adopts the ABA's Model Rules independent of the state's rules)
D. N.M. . . . . . . . . .Rule 83.9
M.D. N.C. . . . . . . . .Rule 103(b)
E.D. N.C. . . . . . . . .Rule 2.10
W.D. Okla. . . . . . . .Rule 4(J)(4)(b)
D. R.I. . . . . . . . . . .Rule 4(d)
D. S.C. . . . . . . . . . .Rule 2.08
E.D. Wash. . . . . . . .Rule 1.2(f)(2)
W.D. Wash. . . . . . .Rule 2(e)(1)
N.D. W.V. . . . . . . .Rule 1.05(a)

## V. *Rules* **plus** *Code Districts*

The following districts have adopted both the Model Rules and the Code in some way (the way is indicated after the district)

N.D. Ala. . . . . . . . .Rule 7(a)(4) (adopts Alabama law, the Code, plus the ABA Rules)
S.D. Ala. . . . . . . . .Rule 1(A)(4) (same as above)
M.D. Ala. . . . . . . . .Rule 1(a)(4) (same as above)
W.D. N.C. . . . . . . .Rule 1A (this is hard to interpret, because it incorporates an oath that refers to both the state's rules and the ABA Canons, which preceded the ABA Code; North Carolina adopted the ABA's Rules in 1985)

W.D. Tex. . . . . . . . .Rule AT–4 (adopts Texas law, the Rules, plus the ABA Code)
E.D. Tex. . . . . . . . .Rule 3(a) (same as above)
D. Utah . . . . . . . . .Rule 1(g) (adopts Utah law, the Rules, plus the ABA Code)
S.D. W.V. . . . . . . . .Rule 1.03(h) (adopts W.V. law, the Rules, plus the ABA Code)

## VI. *Federal Rules Districts*

The following districts have adopted the Uniform Federal Rules of Disciplinary Enforcement.

E.D. Ark. . . . . . . . .Rule 2(e)
W.D. Ark. . . . . . . . .Rule 2(e)
S.D. Ill. . . . . . . . . .Rules 1(f) and 33
D. Maine . . . . . . . .Rule 5
D. Md. . . . . . . . . . .Rule 705
E.D. Mich. . . . . . . .Rule 13
W.D. Mo. . . . . . . . .Rule 2
S.D. Ohio . . . . . . . .Rule 2.6 (this district does not follow Rules XI and XII)
E.D. Pa. . . . . . . . . .Rule 14
W.D. Pa. . . . . . . . . .Rule 22
S.D. Tex. . . . . . . . . .Rule 1L
D. Vt. . . . . . . . . . . .Rule 1D
D. Wyo. . . . . . . . . .Rules 301–312

## VII. *Districts Without Rules*

The following districts have adopted no discernible body of rules to govern attorney conduct. Most of them have local rules saying that attorneys can be disciplined for "bad conduct" of some sort.

D. Alaska . . . . . . . .Rule 3(G) generally governs misconduct
M.D. Ga.
C.D. Ill. . . . . . . . . .Rule 2 generally governs
N.D. Iowa . . . . . . .Rule 5.g generally governs

S.D. Iowa . . . . . . . .same

W.D. Mich. . . . . . . .Rule 19(c) generally governs

N.D. Miss. . . . . . . .Rule 1(c) generally governs

S.D. Miss. . . . . . . . .same

W.D. N.Y. . . . . . . .Rule 3(b)(5)(G) generally, possibly suggests the Code applies

D. N.D. . . . . . . . . . .Rule 2(e)(2) generally governs

N.D. Ohio . . . . . . . .Rule 2.09 generally governs

D. S.D. . . . . . . . . . .Rule 2 generally governs

N.D. Tex. . . . . . . . .Rule 13.2 generally governs

W.D. Va. . . . . . . . . .Rule [1](6) generally governs

E.D. Wis. . . . . . . . .Rule 2.05 generally governs

W.D. Wis.

## VIII. *Unknown or Uncounted*

The District of Minnesota and the Middle District of Pennsylvania have local rules governing professional conduct, but we could not discover the source or nature of those rules. We also omit the district courts outside the 50 states.

*Totals*

| Category | Number | Percent |
|---|---|---|
| Rules | 28 | 31.82% |
| Adopted Rules unilaterally | 0 | – |
| Adopted state's Rules | 28 | – |
| Code | 23 | 26.14 |
| Adopted Code unilaterally | 10 | – |
| Adopted state's Code | 13 | – |
| Rules plus Code | 8 | 9.09 |
| Uniform Federal Rules | 13 | 14.77 |
| No rules | 16 | 18.18 |
| Total | 88 | 100.00% |

KANNE, Circuit Judge, concurring.

With this case we are merely observers of a current trend—one of a series of incremental steps away from ethical standards which set lawyers apart from entrepreneurs. As Judge Easterbrook wryly notes, "The ABA has jettisoned, and the states are in the process of replacing, [an ethical] relic of the rules against champerty and barratry."

I do not see this relic as worthless for I do not believe that the legal profession, or the American public which it serves, is better off when lawyers are first given authority to foment litigation and then are permitted to carry on that litigation at their own cost and risk.

During the past 25 years there has been continuing pressure to convert the lawyer's "professional calling" into a "commercial enterprise" spurred on by egalitarian motives and an urge for unfettered marketplace economics. The desire to make a fundamental change in the lawyer's role in American society is not new. Dean Roscoe Pound described the changes urged for lawyers in the Jacksonian era of the mid–1800's as an effort "to substitute for the profession . . . [a] trade pursuing a money-making calling in the spirit of a business." R. Pound, *The Lawyer from Antiquity to Modern Times*, at XXXVII (1953).

Dean Pound also foresaw the late twentieth century threat to the practice of law from "another era of deprofessionalizing" but he believed that the organized bar would serve as a bulwark against that threat. *Id.* He knew the danger—but as we see from Judge Easterbrook's observation noted above—he greatly misjudged the defense. Yet as in the past, I believe that today's legal "marketing" will pass and "law as a business" will fade as new generations of lawyers strive to retain attributes of service before self-interest which lie at the foundation of a traditional profession.

Because the legal analysis of the majority is correct, I concur.