In the

# United States Court of Appeals
## For the Seventh Circuit

---

Nos. 16-3003 & 16-3052

JUSTIN LUFT, *et al.*,

*Plaintiffs-Appellees, Cross-Appellants*,

*v.*

TONY EVERS, Governor of Wisconsin, *et al.*,

*Defendants-Appellants, Cross-Appellees.*

---

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 11-C-1128 — **Lynn Adelman**, *Judge.*

---

Nos. 16-3083 & 16-3091

ONE WISCONSIN INSTITUTE, INC., *et al.*,

*Plaintiffs-Appellants, Cross-Appellees*,

*v.*

ANN S. JACOBS, Chair, Wisconsin Elections Commission, *et al.*,

*Defendants-Appellees, Cross-Appellants.*

---

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 15-cv-324-jdp — **James D. Peterson**, *Chief Judge.*

_____

ARGUED FEBRUARY 24, 2017 — DECIDED JUNE 29, 2020

_____

Before EASTERBROOK, KANNE, and SYKES, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Change is a constant in Wisconsin's rules for holding elections. Two suits, which we have consolidated for decision on appeal, present challenges to more than a dozen provisions that have been enacted or amended since 2011. Although we have tried to treat similar legal questions together and otherwise simplify the exposition, a brief introduction may help the reader.

Wisconsin used to rely on special registration deputies, who registered voters at places such as high schools. Municipalities could require landlords to distribute registration forms to new tenants. The state replaced these mechanisms with an electronic registration system. 2011 Wis. Acts 23, 240; 2013 Wis. Act 76; 2015 Wis. Act 261. Persons who want to register now must send proof of residence in either electronic or hard-copy format. 2013 Wis. Act 182, as elaborated in a ruling by the Government Accountability Board. (The Board has since been replaced by the Wisconsin Elections Commission, whose members are defendants.) Students who want to prove residence using an educational institution's dormitory list may do so only if the list contains citizenship information. 2011 Wis. Act 23. And to vote for an office other than President or Vice President, voters must have been residents for at least 28 days (instead of 10 days, as before). *Ibid*.

Voters may cast absentee ballots. A ballot may be picked up in person, or the state will mail one, but email and fax

can be used to obtain a ballot in only a few circumstances. 2011 Wis. Act 75. Wisconsin will reject or return an absentee ballot for spoilage, damage, or defective certification. 2011 Wis. Act 227. Such irregularities are visible without opening the ballot; thus they may be remedied before officials feed the ballots through counting machines. Wisconsin also has a variant of early voting: voters may cast their absentee ballots in person. The number of days, and hours per day, allowed for this procedure have fluctuated. See 2011 Wis. Act 23; 2013 Wis. Act 146. Currently the state allows in-person absentee voting (which is to say, early voting) from 14 days before the election through the Sunday preceding it, without any restriction on the number of hours per day that a municipality may choose to keep its offices open. 2017 Wis. Act 369 §1K. Municipalities may offer in-person absentee voting at multiple locations. *Id*. at §1JS.

At the polls, voting a straight ticket is no longer an option. 2011 Wis. Act 23. Observers must remain between three and eight feet from the places where voters announce their presence and register to vote. 2013 Wis. Act 177. Photographic identification is necessary for in-person voting. 2011 Wis. Act 23. Students may use college-issued credentials, but only before an ID's expiration date. Wis. Stat. §5.02(6m)(f). People who lack the documents required to receive a photo ID may petition the state for assistance and a temporary receipt. 2017 Wis. Act 369 §§ 91–95.

This isn't the first time that recent changes in Wisconsin's election system have been before us. We reversed a federal district court's determination, 17 F. Supp. 3d 837 (E.D. Wis. 2014), that the state's requirement of photo ID violates the Constitution and the Voting Rights Act. *Frank v. Walker*, 768

F.3d 744 (7th Cir. 2014) (*Frank I*). And we vacated a subsequent decision, 141 F. Supp. 3d 932 (E.D. Wis. 2015), that construed *Frank I* as having resolved in Wisconsin's favor all arguments relating to particular voters' difficulty in obtaining qualifying photo IDs. *Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016) (*Frank II*). Because the right to vote is personal, the state must accommodate voters who cannot obtain qualifying photo IDs with reasonable effort.

On remand, one district judge ordered Wisconsin to implement an "affidavit option" that excuses the requirement for photo ID when any voter states that obtaining one requires too much effort. 196 F. Supp. 3d 893 (E.D. Wis. 2016). That injunction was promptly stayed, 2016 U.S. App. LEXIS 14917 (7th Cir. Aug. 10, 2016), and the court declined to hear the dispute en banc, though we issued an opinion holding the state to certain representations it made about enforcement. *Frank v. Walker*, 835 F.3d 649 (7th Cir. 2016) (en banc) (*Frank III*). Around the same time a different district court decided that many of Wisconsin's other electoral changes violate either the Constitution or the Voting Rights Act. *One Wisconsin Institute, Inc. v. Thomsen*, 198 F. Supp. 3d 896 (W.D. Wis. 2016). Everyone has appealed from almost every aspect of both district courts' decisions, and we consolidated the appeals.

# I

*One Wisconsin* involves more than a dozen of the provisions mentioned above, each contested under a number of theories. The court's rationales for ruling in the plaintiffs' favor on several provisions overlap, and we consolidate our treatment of them here.

**A**

The judge held that several provisions reflect racial discrimination. For example, the court concluded that the state's reduction in the number of hours available for in-person absentee voting (i.e., early voting) would have a disparate impact on black voters in Milwaukee, because those voters are more likely to use that procedure. What's more, the judge found, state legislators knew of that effect. Yet the state did not have a reason for this change that the judge found persuasive. Many of its explanations, the judge thought, boil down to a desire to promote the chances of Republican candidates compared with Democratic candidates. Because that is a poor if not illegitimate reason, the judge believed, and produces a racially disparate effect, the judge inferred that racial discrimination is the correct explanation.

There are two problems with this approach. First, it is incompatible with the standard for discriminatory intent articulated in *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256 (1979). Second, the belief that a legislature cannot take politics into account when making decisions that affect voting was disapproved (after the district court's decision) by *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019). If one party can make changes that it believes help its candidates, the other can restore the original rules or revise the new ones. The process does not include a constitutional ratchet.

Racial discrimination, as a constitutional matter, occurs only when a public official intends to hold a person's race against him. *Washington v. Davis*, 426 U.S. 229 (1976). See also *Reno v. Bossier Parish School Board*, 520 U.S. 471, 481–82 (1997), and *Mobile v. Bolden*, 446 U.S. 55, 66–67 (1980) (plurality opinion), which apply *Davis* to voting-rights cases. This is

equally true of claims under the Fifteenth Amendment. See *Bossier Parish School Board*, 520 U.S. at 481. And *Feeney* concludes that *knowledge* of a law's consequences differs from *intent* to produce those consequences; equating the two would treat disparate impact as a constitutional violation, something that *Davis* rejected. *Feeney* observed that government often does things that have disparate impact but can be said to intend that effect only when it acts because of, rather than in spite of (or with indifference to), the disparate effect. 442 U.S. at 279.

"*Feeney* holds that it is not enough to show that state actors knew that women would fare worse than men under an official policy; instead the plaintiff must show that the state actors adopted the policy because of, not in spite of or with indifference to, its effect on women." *Bond v. Atkinson*, 728 F.3d 690, 693 (7th Cir. 2013). After all, a legislature "may know what its laws do, yet may not 'intend' all of the consequences." Some may be "fallout from activities undertaken for another reason." *Bieneman v. Chicago*, 864 F.2d 463, 467 (7th Cir. 1988). The doctrine of *Feeney* applies to electoral rules, because it concerns how a court identifies the prohibited intent, rather than any one subject matter.

The district court itself identified one "other reason" for many of the new rules: the desire of a legislature with a Republican majority to improve the chances of Republican candidates. See 198 F. Supp. 3d at 920–21, 925, 934. (There may be other reasons, such as a politically neutral desire to improve the electoral process, but we can bypass them here.) The parties agree, and the district judge found, that race and politics are correlated: black voters are likely to prefer Democratic candidates. Yet the record does not show that the leg-

islators made any of the changes because Democratic voters are more likely to be black (or because black voters are more likely to support Democrats). The changes were made because of politics.

If *Rucho* had held that legislators must disregard politics when modifying the rules for voting (in *Rucho*, drawing district lines), then the district court's analysis would have been stronger: making changes that have a disparate effect, but lack a valid reason, looks discriminatory. But given the holding of *Rucho* that legislators are *entitled* to consider politics when changing the rules about voting—or at least that any contention to the contrary is not justiciable—the basis for inferring discrimination evaporates. This record does not support a conclusion that the legislators who voted for the contested statutes cared about race; they cared about voters' political preferences. Cf. *Cooper v. Harris*, 137 S. Ct. 1455, 1463–64 (2017) (plaintiffs must show that racial considerations predominated over factors such as partisan advantage).

**B**

A second part of the district court's method was to look at each provision in isolation when applying what it called the "*Anderson-Burdick* balancing analysis" (after *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)) to claims under the First Amendment (or the Fourteenth Amendment, a qualifier that we drop from here on). The judge understood these decisions to allow the judiciary to decide whether any given election law is necessary because, if not, it is by definition an excessive burden. That allows a political question—whether a rule is beneficial, on balance—to be treated as a constitutional question and resolved by the courts rather than by legislators.

*Burdick* forecloses that sort of substitution of judicial judgment for legislative judgment. *Burdick* upheld a ban on write-in candidates after concluding that the state's election code *as a whole* imposed only reasonable burdens. Judges must not evaluate each clause in isolation. So we held in *Griffin v. Roupas*, 385 F.3d 1128, 1130–32 (7th Cir. 2004). That decision considered the balance struck by other states, noted the variance in political cultures, and discussed the interaction of individual provisions with the election system as a whole. *Ibid*. A state with liberal access to absentee ballots may well offset this with more stringent verification of eligibility. Another, concerned about the effects of late-breaking information, may favor a system with a shorter (or no) window for early voting.

Because the "right to vote in any manner … [is not] absolute" and the government must play an "active role in structuring elections", election laws "invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. Courts weigh these burdens against the state's interests by looking at the whole electoral system. *Id*. at 434, 439. Only when voting rights have been severely restricted must states have compelling interests and narrowly tailored rules. *Id*. at 434; *Anderson*, 460 U.S. at 788; *Acevedo v. Cook County Officers Electoral Board*, 925 F.3d 944 (7th Cir. 2019).

Wisconsin has lots of rules that make voting easier. It extends the privilege of voting by absentee ballot to otherwise qualified electors who, for any reason, are unable or unwilling to appear at the polls. Wis. Stat. §6.85. It keeps the polls open for thirteen hours, and longer if voters are waiting in line at closing time. Wis. Stat. §6.78. It entitles employees to three hours off from work to vote. Wis. Stat. §6.76. It funds

specialized transportation assistance programs that seniors and people with disabilities can use to get to the polls. Wis. Stat. §85.21. It permits registration in person, by mail, or online. Wis. Stat. §6.30. And it allows voters to register at the polling place immediately before casting a ballot. Wis. Stat. §6.55. These rules make voting easier than do the rules of many other states. We observed in *Frank I* (citing a report by the Census Bureau) that the net effect of Wisconsin's rules had been a higher turnout rate than other states for voters of all races. 768 F.3d at 748–49. These facts matter when assessing challenges to a handful of rules that make voting harder.

## C

Several of plaintiffs' arguments invoke section 2 of the Voting Rights Act, 52 U.S.C. §10301. The district court analyzed these arguments using a two-part test that it attributed to *Frank I*. See 198 F. Supp. 3d at 951. But the two-part test that the district court articulated is one adopted by the Fourth and Sixth Circuits, not by this one. We considered their approach and registered skepticism, not approval. 768 F.3d at 755. Plaintiffs recognize as much and ask us to overrule *Frank I*, but we stick with that decision.

Section 2(b) provides the standard for interpreting §2(a)'s "denial or abridgment" result. Section 2(a) is violated only when, under the totality of the circumstances, the election system is "not equally open to participation" by members of a protected class so that group's members have "less opportunity than other members of the electorate to participate". To the extent that claims related to voter qualification and election mechanics require a comparative "baseline," see *Reno v. Bossier Parish School Board*, 528 U.S. 320, 334 (2000), §2(b)

provides it: opportunity to participate. In other words, §2(b) is an equal-treatment requirement, not an equal-outcome command. See *Frank I,* 768 F.3d at 754. The court must look at the state's actions rather than those of other persons, *id*. at 753, and intent is not an element. See *Chisom v. Roemer*, 501 U.S. 380, 394–95 (1991).

Much §2 jurisprudence involves gerrymandering. To the extent that voters of different races make different choices— for whatever reasons—redistricting that relies on practices like packing and fracturing of racial blocs can dilute the value of voicing those differences. See *Thornburg v. Gingles*, 478 U.S. 30 (1986). Voicing differences is central to participation, and drawing suspect lines means, *ex ante*, that some groups will have less opportunity to do so while others might have more opportunity.

Plaintiffs do not contend that any of Wisconsin's changes reduces their (legal) opportunity to participate in the electoral process. They do say that some changes reduce the likelihood that they will use the opportunities they possess, but *Frank I* held that this does not establish a violation. And although it used a standard from the Fourth and Sixth Circuits instead of the one from *Frank I*, the district court largely agreed with the state's contention that its laws do not reduce voting opportunities. It rejected §2 challenges to the state's elimination of registration by corroboration, requirement of documentary proof of residence, elimination of statewide special registration deputies, and elimination of straight-ticket voting. Nor did it see a §2 problem related to the state's increased durational residence requirement, decreased distance for the election observers' zone, or the ID petition process.

Plaintiffs do not challenge most of these findings on appeal. They do contest the ruling that the petition process—the mechanism by which people who lack the documents required to receive a photo ID may obtain a receipt valid for voting—doesn't violate §2. We are skeptical that the petition process results in race-based problems under the standard that we articulated in *Frank I*. But for reasons we explain later, the process for implementing the photo-ID rule needs more attention on remand.

Many of plaintiffs' arguments, and some of the district court's rulings, suppose that §2 forbids any change in state law that makes voting harder for any identifiable group. *Frank I* rejected that line of argument. 768 F.3d at 752–53. The Voting Rights Act does contain an anti-retrogression rule, but it is in §5(b), 52 U.S.C. §10304(b). Section 5 of the Act has never applied to Wisconsin. Section 2 must not be read as equivalent to §5(b).

## D

Plaintiffs presented arguments under the Twenty-Sixth Amendment (which gives the vote to persons 18 and older) and what they styled "partisan fencing" arguments. Indeed, plaintiffs contested almost every feature of state law under almost every line of argument. The district judge thought that it was not necessary to analyze these arguments separately, provision by provision. He treated arguments under the Twenty-Sixth Amendment (for age) the same as those under the Fifteenth Amendment (for race), and arguments about "partisan fencing" as just different ways of presenting contentions under *Anderson* and *Burdick*. We agree with that assessment, which means that the Twenty-Sixth Amendment and "partisan fencing" need not be mentioned again.

This brings us to the district court's rulings on particular provisions.

## II

## A

The district court determined that 2013 Wis. Act 146 violates the Fifteenth Amendment and permanently enjoined the state from restricting the number of hours municipal clerks could offer in-person absentee voting. 198 F. Supp. 3d at 964. Wisconsin has since eliminated its restriction on the number of hours per day and adjusted the number of days on which municipalities may offer in-person absentee voting. 2017 Wis. Act 369 §1K. The district court, which had the authority to monitor compliance with its injunction, see *Frank III*, 835 F.3d at 652, enjoined §1K on January 17, 2019. The original claim is not moot because both 2013 Wis. Act 146 and 2017 Wis. Act 369 §1K govern the total amount of allowable time for in-person absentee voting. See *Zessar v. Keith*, 536 F.3d 788, 794 (7th Cir. 2008) (discussing recurrence of the complained-of conduct). The order enjoining §1K means that we must address the dispute about its predecessor, on which the new injunction depends.

The district judge found that the reduced hours have a disparate impact on racial minorities. Part I.A of this opinion explains why we disagree with the conclusion that this renders the law unconstitutional. Part I.B shows why this provision cannot be analyzed in isolation. The judge thought that the change made early voting too hard.

Some of the district court's analysis of this provision reflects the assurance of several municipal clerks that their offices have the resources to handle additional hours of early

voting. Yet, as far as national government is concerned, which decisions a state wishes to make statewide, and which locally, are for the state to decide. See *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291 (2014). That some local clerks may disagree with the state's approach does not permit them to enlist a federal court to override the state's judgment about how public employees' time should be allocated. Many states (approximately 20, by the briefs' count) do not offer any early voting; it is hard to see why Wisconsin's marginal adjustment of the number of days and hours when that voting occurs could violate the Constitution.

Part I.C of this opinion largely disposes of challenges to this statute under the Voting Rights Act, but some additional explanation is appropriate.

The district court found that the state's restrictions on in-person absentee voting violate §2 in two ways: by allowing just one location per municipality and by restricting the number of days and hours offered. As for the first: if the single authorized location is convenient for one racial group and inconvenient for another, that could violate §2's equal-treatment principle. The opportunity to participate may decrease as distance increases. Yet the Milwaukee clerk's office is centrally located. What's more, 2017 Wis. Act 369 §1JS amended Wis. Stat. §6.855 to authorize municipalities to designate multiple sites for in-person absentee voting. See Wis. Stat. §6.855(5). The one-location rule is gone, and its replacement is not substantially similar to the old one. It seems unlikely that Wisconsin would return to a single-site requirement if allowed to do so. We remand with instructions to dismiss this aspect of the suit as moot. See *Friends of the*

*Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000); *Zessar*, 536 F.3d at 794.

The changes to Wis. Stat. §6.86(1)(b) do not moot the parties' dispute about the amount of time allowed for in-person absentee voting. Act 369 §1K removed time-of-day restrictions and increased the permissible number of days on which voters could cast absentee ballots in person. Marginal changes of this kind do not amount to the sort of voluntary discontinuation, with assurances against recurrence, that produce mootness.

We do not see a substantive problem with days-and-hours limitations, however. They leave all voters with equal opportunities to participate. Early voting is not a fundamental right in itself; it is but one aspect of a state's election system. As we have stressed, Wisconsin's system as a whole is accommodating. So long as a state treats all voters equally, §2 does not limit the state's control of details such as hours for early voting.

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016), holds that a change similar to Wisconsin's comports with both the Constitution and §2 of the Voting Rights Act. We agree with that decision and reverse the district court's finding that the time-of-day and number-of-days restrictions violate §2 of the Voting Rights Act.

## B

The district court analyzed a variety of provisions under the *Anderson-Burdick* framework, which we introduced in Part I.B.

**1.** One of these is the one-location rule and the restrictions on both the number of hours per day and number

of days for in-person absentee voting, which we have addressed (for purposes of other theories) immediately above. The judge thought that these provisions together place a moderate burden on the right to vote. 198 F. Supp. 3d at 931. Because the state's justification fails to outweigh the burden, in the judge's eyes, he concluded that the restrictions violate the First Amendment. *Id*. at 934–35.

This instantiates the sort of analysis that Part I.B disapproves. In isolation, any rule reducing the number of days or hours available for any kind of voting seems like an unjustified burden. But electoral provisions cannot be assessed in isolation. Wisconsin's many other provisions that make it easy to vote cut in its favor. One less-convenient feature does not an unconstitutional system make.

The district court erred, too, in assessing these features as written ("on their face," lawyers like to say) rather than as applied. The judge did not find that either the electoral system as a whole, or the days-and-hours rules for early voting, makes it hard for anyone to vote in Wisconsin. And the single-location provision has been rescinded. We reverse the district court's finding that the number of hours per day and the number of days for in-person absentee voting violate the First Amendment.

**2.** The district court found that Act 23's requirement that college and university "dorm lists" include citizenship information violates the First Amendment. 198 F. Supp. 3d at 938. We need not reach the constitutional issue; federal law preempts the requirement. In particular, as a condition to its grant of federal funds, the Family Educational Rights and Privacy Act, 20 U.S.C. §1232g, prohibits educational agencies or institutions from releasing "personally identifiable infor-

mation … other than directory information", except for circumstances not pertinent here. Directory information does not include citizenship status. 20 U.S.C. §1232g(a)(5)(A). Wisconsin does not argue that it wants its educational agencies and institutions to decline federal funds in order to comply with Wis. Stat. §6.34(3)(a)(7)(b), nor does it contend that we should apply any presumption against preemption. And the state may encounter an additional problem under §5 of the National Voter Registration Act, 52 U.S.C. §20504, though we need not decide. We conclude that 20 U.S.C. §1232g precludes the state from requiring educational agencies and institutions to include citizenship information on certified lists of students who reside in sponsored housing. Thus we affirm the district court's judgment, though for a different reason.

**3.** The district court also deemed Act 23's increase in the durational residence requirement (from 10 days to 28 days) to be unconstitutional. 198 F. Supp. 3d at 944. Otherwise-qualified voters who move to a new district within 28 days before an election may not vote in the new district for an office other than President and Vice President. Wis. Stat. §6.15(1). Residents unable to qualify as electors in a new state may cast absentee ballots in their former Wisconsin district for any presidential election that occurs within 24 months of leaving Wisconsin. Wis. Stat. §6.18. If the move occurred within Wisconsin, the voter may cast a ballot for any office in the former district. Wis. Stat. §6.10. Voters may do this in person or by absentee ballot. Wis. Stat. §§ 6.85(2), 6.86(1), (3). As the district court notes, these options "reduce the burden that the law imposes, but they do not negate it entirely." 198 F. Supp. 3d at 941. Yet "negation" is not the constitutional standard.

Wisconsin's 28-day window is close to the national norm and less than the 30-day window that is subject to a safe harbor for federal elections. 52 U.S.C. §20302(a)(2). It is less than the 50-day window that the Supreme Court held to be constitutional for Arizona. See *Marston v. Lewis*, 410 U.S. 679 (1973). Plaintiffs have not identified any feature of Wisconsin's law that makes a 28-day window more onerous in that state than 50 days was in Arizona. Although *Dunn v. Blumstein*, 405 U.S. 330 (1972), holds that 90 days in Tennessee is too long, it added that 30 days is permissible.

"States have valid and sufficient interests in providing for *some* period of time—prior to an election—in order to prepare adequate voter records and protect its electoral process from possible fraud." *Marston*, 410 U.S. at 680 (emphasis in original). Wisconsin's interests in safeguarding its open primaries and polling-place registration, Wis. Stat. §§ 5.37(4), 6.55(2)(a), are sufficient in this sense. Plaintiffs seek to distinguish *Marston* and *Dunn* on their facts. It's true that Wisconsin's election system differs from those of Arizona and Tennessee, but most differences that we perceive make it easier to vote in Wisconsin. We reverse the district court's finding that the 28-day durational residence requirement violates the Constitution.

**4.** The district court concluded that, together, 2013 Wis. Act 182's requirement for documentary proof of residence and Act 23's elimination of proof by other persons' corroboration imposed slight burdens on voters, 198 F. Supp. 3d at 935, and that the provisions do not violate the Constitution. Plaintiffs challenge this aspect of the decision. In considering the burden, the district court observed that, because Wis. Stat. §6.34(3)(a)(11) authorizes proof via any "document is-

sued by a unit of government", clerks may mail a letter to a voter's address so that the letter itself suffices as proof. 198 F. Supp. 3d at 936. It also noted that the Government Accountability Board issued a ruling in August 2012 requiring election officials to accept electronic versions of proof of residence. *Id*. at 907, 936. To this analysis we add that Wisconsin's election system is generous in permitting same-day registration at the polling place. Wis. Stat. §6.55(2)(a). However, "a person does not have a federal constitutional right to walk up to a voting place on election day and demand a ballot." *Marston*, 410 U.S. at 680. Proof of residence helps assign voters to their proper districts and is valid for that reason alone. We affirm the district court's decision on this issue.

**5.** The district court determined that 2011 Wis. Act 75, which prohibits election officials from sending absentee ballots via email or fax to all but a few categories of voters, Wis. Stat. §6.87(3), violates the Constitution. 198 F. Supp. 3d at 948. We reverse this aspect of the decision. The district court identified some voters who might be inconvenienced by this rule—road warriors who may be out of state, or leisure travelers who don't plan ahead. This is not a plausible application of *Anderson* and *Burdick*. As we have emphasized, all parts of the electoral code must be considered, and travelers have many ways to vote in Wisconsin. Some travelers' potential inconvenience does not permit a court to override the state's judgment that other interests predominate. Wisconsin wants to control errors arising from the fact that faxed or emailed ballots cannot be counted by machine and to protect the secrecy of the ballot.

Plaintiffs observe that Wisconsin allows military voters to use fax or email, but a state could reasonably conclude that

members of the military face special problems (they cannot travel freely and may be unable to return to the state to use its regular voting methods), which justify willingness on the state's part to accept the burdens that fax or email cause for the vote-counting process.

## C

Unexpired student IDs (that expire within two years of the date of issuance) may be used when voting, but expired student IDs may not. Wis. Stat. §5.02(6m)(f). The district court held that this difference violates the Equal Protection Clause. It concluded that the state lacks a rational basis for its treatment of students. 198 F. Supp. 3d at 962. Wisconsin has since added technical colleges to the list of institutions authorized to issue valid student IDs, 2017 Wis. Act 369 §1, which the district court enjoined on January 17, 2019.

The district court's conclusion is hard to accept. The rational-basis standard is not demanding. *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, 139 S. Ct. 1780 (2019). Drawing a line between current and expired documents serves a "legitimate governmental purpose". *Heller v. Doe*, 509 U.S. 312, 320 (1993). The Transportation Security Administration draws the same line for the purpose of boarding an airplane; we do not see why the line is forbidden for voting. Section 5.02(6m) requires almost all identifying documents—operators' licenses, passports, military identification, veteran's identification, and identification issued under §343.50—to be current, if they are to be used for voting. The period of validity varies by type of identification. Compare Wis. Stat. §5.02(6m)(a)(4), with subsection (b). Only identification issued by federally recognized Wisconsin tribes escapes the

expiration conditions. *Id*. at §5.02(6m)(e). There's nothing wrong with a requirement that IDs be current.

There is still a problem. A student ID card, alone among the sorts of photo ID that Wisconsin accepts, is not sufficient for voting unless the student also shows proof of current enrollment. *Id*. at §5.02(6m)(f). No other category of acceptable identification—including for drivers, military members, passport holders, or veterans—depends on ongoing affiliation of any sort. The statute sets students apart in this respect, and the state has not tried to justify this distinction. We take the omission as a concession that it lacks a rational basis. This is not, as the district judge believed, because redundant requirements in statutes—such as current ID + proof of enrollment—are invariably irrational. Many a lawyer prefers a belt-and-suspenders approach. The problem here is that students are treated differently from other potential voters, and the state has left that difference unjustified. We affirm that part of the judgment on this alternate ground.

## III

Both district courts found fault with the way Wisconsin implements the holding of *Frank II* that voting rights are personal, so that each eligible person must have a path to cast a vote. Wisconsin's requirement that persons produce photo IDs at the polls may block voting by persons who encounter substantial difficulty in obtaining the documents (such as birth certificates) that Wisconsin requires for those who do not already have passports, drivers' licenses, or other acceptable credentials.

Wisconsin decided to address this problem with what it calls the petition process. A person who has trouble assem-

bling essential documents can petition the state for an exception. Wis. Stat. §343.165(8)(a); Wis. Admin. Code §Trans 102.15(5m). Both district courts found that some voters would expend more than reasonable effort navigating the petition process. For some people it can entail lots of time, personal effort, red tape, and heightened emotion. See 196 F. Supp. 3d at 909–11; 198 F. Supp. 3d at 914–16. Both courts considered the process unconstitutional as implemented, or likely so. Both issued injunctions. We review each in turn.

## A

The injunction issued by the Eastern District of Wisconsin permitted any registered voter to declare that reasonable effort failed to yield acceptable photo ID. The injunction allowed a voter to make his or her choice about how much effort was too much—some people might deem even one trip to a governmental bureau excessive—and barred the state from contesting any person's conclusion. 196 F. Supp. 3d at 919–20. We stayed that injunction, explaining:

> Our most recent decision in this case [*Frank II*] concluded that anyone who is eligible to vote in Wisconsin, but cannot obtain a qualifying photo ID with reasonable effort, is entitled to an accommodation that will permit him or her to cast a ballot. *Frank v. Walker*, 819 F.3d 384 (7th Cir. 2016). On remand, the district court concluded that at least some voters fall in this category, notwithstanding the most recent revisions to the procedures that Wisconsin uses to issue photo IDs. But instead of attempting to identify these voters, or to identify the kinds of situations in which the state's procedures fall short, the district court issued an injunction that permits any registered voter to declare by affidavit that reasonable effort would not produce a photo ID—even if the voter has never tried to secure one, and even if by objective standards the effort needed would be reasonable (and would succeed).

> The district court's injunction allows any registered voter to check a box stating a reason why reasonable effort would not produce a qualifying photo ID. The boxes include lack of necessary documents (apparently including situations in which the person has not tried to obtain them), "work", "family responsibilities", and "other"—and the voter can put anything in the "other" box, including a belief that spending a single minute to obtain a qualifying photo ID is not reasonable. The injunction adds that state officials are forbidden to dispute or question any reason the registered voter gives. Yet the Supreme Court held in *Crawford v. Marion County Election Board*, 553 U.S. 181, 198 (2008), that "the inconvenience of making a trip to the [department of motor vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." A given voter's disagreement with this approach does not show that requiring one trip to a governmental office is unreasonable.
>
> Because the district court has not attempted to distinguish genuine difficulties of the kind our opinion mentioned, 819 F.3d at 385–86, or any other variety of substantial obstacle to voting, from any given voter's unwillingness to make the effort that the Supreme Court has held that a state can require, there is a substantial likelihood that the injunction will be reversed on appeal.

2016 U.S. App. Lᴇxɪs 14917 (7th Cir. Aug. 10, 2016). That brief discussion says all that really needs to be said about this injunction.

Permitting voters to file affidavits to obtain voting credentials isn't problematic when the legislature authorizes it. Other states have done so. See, e.g., Idaho Code §34-1114; Ind. Code §3-11.7-5-2.5(c); La. Rev. Stat. §18:562(A)(2)(b); S.C. Code §7-13-710(D)(1)(b). But when the legislature uses different means, courts must ask whether those means are themselves invalid. One federal judge's preference for using

affidavits does not prevent a state legislature from implementing a different approach.

## B

The injunction issued by the Western District of Wisconsin requires the state to issue a voting credential promptly on receipt of materials sufficient to initiate the petition process, unless the state has information showing that the potential voter is disqualified. 198 F. Supp. 3d 964–65. We denied a motion to stay that injunction pending appeal. The state does not disagree with the district court's fundamental approach—which for the most part requires the state to do what it told the judge it *is* doing—as much as it worries that an injunction will make it impossible to alter the petition process as it learns how things work. Persuading a court to modify an injunction under Fed. R. Civ. P. 60(b)(5) can be difficult. See *United States v. Swift & Co.*, 286 U.S. 106, 119 (1932); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367 (1992). And that has proven to be so. The state replaced its temporary rule with a final one, Wis. Admin. Reg. CR 16-040 (Apr. 24, 2017), then adjusted and codified portions of that approach. 2017 Wis. Act 369. The district court enjoined §92 of Act 369 on January 17, 2019. The 2019 injunction is not part of this appeal, but we do have to consider the injunction the district court issued earlier, and on which the 2019 relief rests.

The constitutional question under *Frank II* is whether the state ensures that every eligible voter can get a qualifying photo ID with reasonable effort. *Frank III* says that the state's process, *as the state describes it*, is adequate to that end, *if reliably implemented*. But are those conditions met?

The state's procedure gives each person claiming eligibility to vote a rebuttable presumption of eligibility: on receipt of designated materials, the state issues a credential as a matter of course (though the person may need to appear to be photographed). Wis. Stat. §343.50(1)(c); Wis. Admin. Code §Trans 102.15(6m). Administrative steps such as gathering documents, making a trip, and posing for a photograph, are no more than what *Crawford v. Marion County Election Board*, 553 U.S. 181, 198 (2008), considered reasonable. Those who find it difficult to assemble the required documentation face "somewhat heavier" burdens. 553 U.S. at 199. To prevent the burden from becoming excessive, Wisconsin promised to provide photo ID to anyone who, "more likely than not", meets the requirements. Wis. Stat. §343.165(8)(h); Wis. Admin. Reg. CR 16-040 §10.

Plaintiff Johnny Randle's experience shows why that may be hard to implement reliably. The name he used for more than seven decades differs from that of his birth certificate in spelling but not in pronunciation. After submitting his petition, Randle needed more than a dozen telephone calls, two in-person visits, and responses to multiple requests for information. The state demanded that he legally change his name and then declined to issue a voting credential because it asserted inability to verify his statement that he had done that already. The state asked him to sign a declaration that he had changed his name's spelling at common law. It capped the five-month process by denying the petition when his agent did not produce a power of attorney.

Wisconsin asserts that the procedures it has recently established would have short-circuited that process by allowing the employees who interviewed Randle to look up the

records using his date of birth and his mother's maiden name, conclude that he had innocently been using a variation on the original spelling, and issue a voting credential. Wisconsin recognizes name changes at common law as long as the usage is consistent, continuous, and non-fraudulent. *State v. Hansford*, 219 Wis. 2d 226, 246–47 (1998). It asserts that the current version of its petition process, which it wants to implement, recognizes this and would simplify life for Randle and many others. Wisconsin allows common-law name changes for driver's licenses and the like, and its new petition process requires the officials to accept a name change when an applicant submits a statement declaring the common-law elements as well as the prior name and its discontinuance. Wis. Stat. §343.50(3)(c); Wis. Admin. Reg. CR 16-040 §§ 1–3.

We stressed in *Frank III* that appropriate treatment of the petition process depends on how it works. Although that process has been a moving target from *Frank II* until today, we do not blame the state for displaying flexibility. It has had to see what problems are easy to solve and which are tougher. The district court acted on a record assembled years ago. Instead of trying to evaluate the adequacy of a process that the state once championed, but now wants to change, the best approach is to let it try and see what happens. Adequacy cannot be evaluated in the abstract.

The state's interest in the "integrity and reliability of the electoral process" is strong. *Crawford*, 553 U.S. at 204; *Frank I*, 768 F.3d at 755. Every citizen's interest in individual treatment also is strong. That's the holding of *Frank II*. Although the state must be allowed to experiment and see what happens, we can say a bit more about the injunction the district

court issued. The judge stated that a would-be voter's "failure to provide additional information or communication to the DMV [Department of Motor Vehicles] is not good cause" for declining to issue a photo ID. 198 F. Supp. 3d at 964. That language allows applicants to convert a rebuttable presumption of eligibility into an absolute entitlement just by declining to cooperate with a request for information that is either readily available or obtainable with reasonable effort. Our decisions in *Frank I* and *Frank II* do not permit applicants to stop the verification process unilaterally. When the district court looks into this subject again on remand, it must not order any relief that excuses applicants from the failure to comply with reasonable requests for information that is material to voting eligibility.

## IV

This is complex litigation, and to keep this opinion manageable we have omitted some lines of argument and abbreviated the treatment of others. A few contentions pursued in the district court have been dropped on appeal. We have considered all that remain, and we agree with the district courts' handling of any issues that we have not mentioned.

We affirm in part, reverse in part, and vacate in part, the judgments of the Western District. We reverse the district court's finding that the adjustments to the number of days and hours for in-person absentee voting, the state's durational residence requirement, and the prohibition on sending absentee ballots by email or fax violate the Constitution, the Voting Rights Act, or both. We vacate the district court's orders related to the one-location rule and the ID petition process and remand both, the former with instructions to dismiss as moot and the latter for further proceedings. We

affirm the district court's judgment that Wisconsin's student-ID provision is invalid and its judgment concerning citizenship on educational institution's dorm lists, though on alternate grounds for each. We otherwise affirm the district court's judgment. We reverse the Eastern District's injunction requiring Wisconsin to implement an affidavit option.

We suggest that all of these cases be assigned on remand to a single judge. The Chief Judge of the Seventh Circuit has designated the judges of each district to sit in the other. Using that cross-designation to place all of this litigation before a single judge will eliminate the sort of inconsistent treatment that has unfortunately occurred in the photo-ID parts of the multiple suits.